UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| KENNETH LEWIS FAULKNER | ) | 1:08-cv-00806-JMD-HC |
| | ) | |
| Petitioner, | ) | ORDER DENYING PETITION WITH |
| | ) | PREJUDICE |
| v. | ) | |
| | ) | ORDER DIRECTING CLERK TO ENTER |
| MULE CREEK STATE PRISON, | ) | JUDGMENT |
| | ) | |
| Respondent. | ) | ORDER DECLINING TO GRANT |
| | ) | CERTIFICATE OF APPEALABILITY |

Petitioner Kenneth L. Faulkner ("Petitioner") is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**Procedural History**

On February 8, 2006, a jury convicted Petitioner of one felony count of annoying or molesting a child under the age of eighteen (Cal. Pen. Code § 647.6(c)(1)) and two misdemeanor counts of annoying or molesting a child under the age of eighteen (Cal. Pen. Code § 647.6). (Lod. Doc. 4 at 2).

The California Court of Appeal affirmed Petitioner's conviction and sentence on November 16, 2007. (Lod. Doc. 4).

The California Supreme Court denied Petitioner's petition for review on February 27, 2008. (Lod. Doc. 6).

Petitioner filed the instant petition for writ of habeas corpus in the United States District Court, Eastern District of California on May 14, 2008. (Doc. 1). Respondent filed an answer to the

Petition on October 6, 2008.  (Doc. 15).  Petitioner filed a reply to Respondent's answer on September 1, 2009. (Doc. 29).

Both Petitioner and Respondent have consented to Magistrate Jurisdiction pursuant to 28 U.S.C. § 636(c)(1). (Docs. 8, 14).

### Factual Background[1]

**Count IV- Misdemeanor Annoying C.M. on or about November 29, 2003**

B.M. and C.M. are sisters. Their family frequented the Sierra Theater in Delano. When C.M. was 11 years old, appellant spoke to her and to B.M. when they came out of the Sierra Theater. Appellant had a green bicycle when he spoke to them. The sisters were leaving the theater after dark to wait for their parents to pick them up. The theatre door slammed as they left. Although the door was already broken, the girls thought they had broken it. Appellant said to them, "[O]hh, you guys broke it, you guys better run." They tried unsuccessfully to call their mother. Appellant then asked for their names. B.M. was uncomfortable and mumbled an inaudible response. C.M. was also uncomfortable because appellant had a "scary face" and had just walked up to them. Nevertheless, she gave her name and conversed with appellant. B.M. pretended to speak on her cell phone to avoid appellant because she was scared he might grab her or do something.

Appellant stood astride his bicycle, which was about one foot from the two girls. Appellant spoke to C.M. about his visit to the Philippines and also told her he went to the library. He then asked whether the sisters went to the library. Appellant asked whether C.M. was the one who went there all the time and she replied, "Yes." At that point, a woman approached and asked the girls whether appellant was bothering them. Appellant told the woman, "No," and claimed he was not bothering them. C.M. testified she was uncomfortable and scared at that point.

C.M. did not identify appellant at the trial. However, she recalled viewing a photographic lineup at the Delano Police Department and identifying one of the subjects as the man who approached her and her sister at the theater. C.M. testified she was sure of her identification. Officer Vincent Lopez showed B.M. a six-photo lineup shortly after the incident. She initially did not recognize anyone and then made an identification after taking some time to view the array of pictures. Both sisters identified appellant's photograph (labeled No. 03D03051).[2] Officer Lopez testified there was no hesitation before the sisters made their identification of appellant.

**Count II--Misdemeanor Annoying B.K. on or about December 6, 2004**

On December 6, 2004, B.K. was waiting for a bus on the corner of Niles and Oswell Streets in Bakersfield. The bus stop was located in front of the Mobil gas station and

---

[1] The Court adopts the California Court of Appeal's statement of facts.  (Lod. Doc. 4at 3-11).

[2] [Court of Appeal's footnote 3] Officer Lopez said he admonished B.M. and C.M. that the person who accosted them might or might not be in the lineup. He gave the admonition before each sibling separately viewed the photo lineup. Neither B.M. nor C.M. recalled the admonition. The prosecutor asked B.M. if she remembered what, if anything, the officer told her or asked her. She responded, "He just said do you recognize the person - or - yeah." The prosecution asked C.M. whether the officer told her anything. She responded, "He just told me to point the one that was communicating with me and my sister."

she was going to take the bus to travel from school to home. B.K. had waited five or 10 minutes when appellant approached the bus stop from across the street. He limped and used a cane to walk. B.K. noticed there was something wrong with one of his arms and one of his eyes appeared unusual. Appellant came to the bus stop and spoke to B.K. He asked whether she had seen a piece of his bong. B.K. said, "No," and they began a conversation. B.K. testified that appellant's conduct and statements shocked her and made her feel weird.

Appellant asked about B.K.'s age and residence. She told appellant she was 17 years old even though she was only 14. B.K. did not want appellant to come to her house so she only gave an area and not a specific address. Appellant told B.K. if she ever needed alcohol, he lived across the street form a liquor store and would buy some for her. Appellant pointed out his residence, said he could provide her with drugs, and asked whether she partied.

B.K. said she felt disgusted when she talked to appellant. She told appellant she already had a boyfriend. Appellant said the boyfriend did not need to come to appellant's place to party. Appellant said he liked to keep a low profile. When B.K. asked whether he was in trouble with the law, appellant said, "[T]hat's what I'm trying to avoid." Appellant then asked whether B.K. had a problem with older men. He gave B.K. his telephone number and some candies. B.K. said she was afraid for her safety and boarded the bus as soon as it arrived. Appellant did not follow her onto the bus.

Later that day, B.K. reported the conversation to Deputy Sheriff Scott Lopez. She told Lopez that appellant said she should call him if she wanted to party at his house. B.K. gave Lopez the piece of paper bearing appellant's telephone number. About three months later, Sheriff Detective Martin Downs devised a plan in which B.K. would make a pretext call to appellant and have appellant repeat the statements he made to her at the bus stop. B.K. agreed to the plan and she made the pretext call from the sheriff's office in Oildale on March 10, 2005. Deputies recorded the conversation and the prosecutor played the recording for the jury.

During the pretext call, B.K. tried to remind appellant about their meeting three months earlier. She mentioned such details as his offer to buy her beer and his invitation to go to his home to smoke marijuana. When B.K. asked, "[D]o you remember me," appellant said it might sound familiar. B.K. told appellant she was ditching school and wanted to party with appellant. She also said she was "only 14." Appellant said that was "okay" and indicated he had some "good stuff" to smoke. B.K. then told appellant she was apt to become "horny" when she partied. Appellant said it was okay with him, but he preferred to talk in person about what he was "into." Appellant assured B.K. he had condoms and said they would walk to his house after they met. Appellant noted that B.K. had a bicycle and that he himself enjoyed bike riding. He suggested they take bicycle trips to Hart Park and other such places on weekends. Appellant explained he was just seeking friendship with someone.

When appellant again asked B.K. where she lived, B.K. repeated, "by Foothill," and added, "[o]n Monica Street." Appellant told B.K. he had caller identification service and now he had her telephone number. Appellant then asked B.K. what she looked like because he did not remember. He teased her about being conceited when she said she was pretty. Appellant determined that B.K. recalled appellant's appearance and that she did not find him to be ugly. When B.K. asked appellant whether he was "a cop," appellant replied in the negative. He then asked whether B.K. was working with the cops. She assured appellant she was not and said she hated cops. Appellant told B.K. he was "kind of scared" and asked whether she was working for the police. B.K. asked appellant not to call her after 5:00 p.m. because her parents would be home and

she did not want her parents to know. They agreed to ride their bicycles and meet at a Chevron [*10] gasoline station at 2:00 p.m. Before B.K. departed the sheriff's office, she received a call back from appellant. This occurred between five and 10 minutes after completion of the pretext call. Appellant asked B.K. why she was calling from Oildale when she said she lived in a different area.

**Count I--Felony Annoying of V.G.**

On June 7, 2005, 16-year-old V.G. was waiting for a bus on the corner of Oswell and Niles Streets in Bakersfield. The bus stop was located in front of the Wesley Methodist Church and V.G. intended to travel to the Valley Plaza Shopping Center. Appellant sat down a few seats away from V.G.'s seat. He spoke to her first by saying, "Hello," and she responded, "Hi." V.G. answered her cell phone while they were waiting. When she was through, appellant asked her which telephone company she used. She told him Cingular and he then inquired about the games on her phone. Appellant listed the games on his own phone, including golf. This led V.G. to mention she was on her school's golf team. V.G. testified she conversed with appellant because she had been raised to be polite.

Appellant asked if she had ever played miniature golf and she indicated she had not. Appellant then told V.G. he would like to take her miniature golfing. This made V.G. feel uncomfortable and upset. She checked the time on her cell phone, indicated the bus should be arriving soon, and got up and walked away. As she began to leave, appellant told her he would like to call her sometime. V.G. responded, "No," and she walked away from appellant. She said appellant made her feel uneasy because he was a stranger, he was older, and she was not interested in going anywhere with him. Instead of taking the bus to Valley Plaza, V.G. decided to walk home.

V.G. was at school the next morning and appellant tried several times to speak to her on her cell phone. She took a final examination and then listened to a voicemail from appellant at 9:00 a.m. V.G. had a male friend answer her cell phone and instruct the caller to stop calling V.G.'s number. When V.G. answered a call in the afternoon she heard appellant say "hello." V.G. immediately discontinued the call. V.G.'s sister-in-law called the telephone number that appellant had left in a voicemail message. The sister-in-law advised appellant that V.G. was 16 and that appellant should stop calling her. Within a few minutes, someone called V.G.'s phone but she ignored the call.

V.G. was upset and confused and told her mother about the telephone calls. V.G.'s mother reported the incident to law enforcement. Kern County Sheriff's Deputy Scott Lopez contacted V.G. in response. V.G. had saved the voicemail messages and she provided the sheriff's department with the phone and password access to the voicemail messages. The jury listened to a recording of appellant's voicemail messages made to V.G.'s phone. Appellant stated: "Hey [V.G.]. This is, this is 717-7727. I met you yesterday um, give me a call back. I'm, I just didn't answer the phone in time. I'm waiting, okay. Bye. Oh, try calling me, 871-3653. Okay? Talk to you later. Bye." In another message, appellant stated: "Hey, this is Ken. Call me back [V.G.]. My number is 871-3653." Just after V.G.'s sister-in-law called, appellant called and stated: "Hey [V.G.], you just called me. My number is 717-7727. Call me back at 871-um, 3653. Okay. Bye."

In a bifurcated proceeding, the trial court found true the allegation that appellant was convicted on December 13, 2004, of annoying or molesting a child (§ 647.6).

Appellant's June 2005 Statements to Deputy Lopez and Detective Downs

In the late evening of June 8, 2005, Deputy Lopez contacted appellant by calling the number appellant left on V.G.'s voice mail. Although the conversation was not recorded, Deputy Lopez refreshed his recollection of the conversation by reviewing his contemporaneous report. Appellant initially told Lopez he had gone to the bus stop to catch the bus and not to contact the teenage girl. Appellant said he changed his mind and did not board the bus when it arrived. According to Deputy Lopez, later in the conversation appellant admitted going to the bus stop for the purpose of contacting V.G. Appellant told Lopez he had a problem that needed to be addressed.

On June 27, 2005, Sheriff's Detective Martin Downs contacted appellant using the telephone number appellant provided to B.K. Detective Downs recorded his conversation with appellant and the prosecution played the recording for the jury. At the time of their conversation, Detective Downs was not aware that appellant claimed some form of brain damage.[3] Downs told appellant not to contact "that little girl [B.K.] anymore." Appellant responded, "I don't even know any little girl named [B.K.]." When the defective clarified his statement and mentioned "that girl you met at the bus stop that day," appellant replied, "Okay." Appellant said he received a call from B.K. and he was just returning the call. Appellant claimed he did not know how she obtained appellant's telephone number. Appellant said he did not answer the call from B.K. because he was away from his telephone at that time. Detective Downs told appellant that B.K. only knew appellant as "Ken." Downs also said B.K. did not know appellant's last name. Appellant said he also did not know B.K.'s last name.

Appellant told Downs that B.K. had begun the conversation by asking him for the arrival time of the bus. When the detective said it was odd that a 14-year-old girl would have appellant's telephone number, appellant said, "I don't know if she was fourteen." Appellant told Downs he was not going to call B.K. again and said, "I'm not going to bother her anymore." Appellant told the detective he did not recall an incident in which he gave his phone number to a girl named B.K. at a bus stop near Niles and Mount Vernon in December 2004. Appellant claimed she called him months later because she wanted to party with him. He arranged to meet her at the Chevron station. The detective told appellant the conversation had been recorded and he offered to play the recording for appellant. Appellant declined to listen to the recorded conversation.

Detective Downs questioned appellant about his drives and desires with respect to younger girls. Downs asked, "Why the constant attraction to these younger girls?" Appellant responded, "I don't know what you mean." The detective asked why appellant contacted them and gave them his telephone number. Appellant said it would not happen anymore "if it ever has happened." Downs insisted the root cause of the situation needed to be explored so that no more children would be contacted. Downs asked appellant what he had done to "prevent it from being a problem." Appellant said there would be no further problems and the situation would not happen. Downs asked appellant whether he had taken steps to get counseling. Appellant said he had done so by going to the Mary Kay Shell Center. The detective asked if the sessions were helping appellant and the latter said, "Yes." Downs also asked whether appellant was now able to control his "drives and desires." Appellant answered in the affirmative and added, "I can control myself in any situation." Appellant assured Detective Downs that if he saw a teenage girl at a bus stop he would not speak or flirt with her.

---

[3] [Court of Appeal's footnote 4] Detective Downs said he first became aware of this claimed damage when defense counsel alluded to it at trial.

In July 2005, Detective Downs and two other sheriff's deputies contacted appellant at his Oswell Street residence in Bakersfield. Appellant resided in the area described by B.K. Appellant's apartment was accessed off an alleyway running north from Niles Street. The alley was almost directly across the street from the bus stop where appellant contacted B.K. Officers found 37 "Family Planning" brand condoms in a brown sack in the living room. The brown sack was located next to a bed. Appellant said he had a roommate but the roommate was not present and appellant did not know his whereabouts. Investigating officers did not obtain the telephone records for V.G., B.K., or for appellant's cellular telephone.

**Evidence of Uncharged Acts**

T.L. was 16 years old in 2004. On July 27, 2004, T.L. got onto a bus after school and appellant also got onto the bus and sat by her. T.L. was involved in a conversation with some friends and someone mentioned drugs. Appellant interrupted their conversation and talked about "cook[ing]" drugs. The bus broke down and everyone got off. Appellant walked up to T.L. and began talking to her. He touched her face and said she was pretty. T.L. became angry. Appellant then told her he was getting a large sum of money together so he could take her all over the world to places where they could be "legal" together. Appellant told her they could have "pretty children" together. T.L. thought appellant's statements were "gross" and she felt he was going to harm her.

T.L. told her mother about the incident and her mother called the police. The police asked T.L. whether she would make a pretext call to appellant and she agreed. During the pretext phone call, appellant told T.L. he wanted to see her and wanted to have sex with her. Appellant told her that if anyone asked her age, she should say she was 18. Appellant's statements disturbed T.L. Appellant and T.L. agreed to meet at a Johnny Quik Market. Appellant said he would take her from the store to his house. The police transported T.L. to a position across from the store. She identified appellant and officers placed him under arrest.

In 2003, D.A., then age 14, was at the World Harvest Church in Delano. A man approached her outside of the church bathroom. D.A. identified a photograph of appellant as the man who approached her. However, she was unable to make an in-court identification. Appellant asked D.A. for her name and address. When she refused to disclose her address, appellant repeatedly asked her. D.A. told a church usher about the incident. On another occasion, appellant approached D.A. and asked for her telephone number. However, she refused to give the number to him. D.A. said she was disturbed by appellant's behavior.

On another occasion in 2003, M.G., then age 14, was leaving the Sierra Theater in Delano when a man followed her. M.G. was unable to make an in-court identification of the man. However, she examined a photograph of appellant and said, "I believe it's him." The man asked M.G. for her name but she refused to disclose it. He continued to follow her and asked for her name and telephone number.

## Discussion

**I.     Jurisdiction and Venue**

A person in custody pursuant to the judgment of a state court may file a petition for a writ of habeas corpus in the United States district courts if the custody is in violation of the Constitution or

laws or treaties of the United States. 28 U.S.C. § 2254(a);[4] 28 U.S.C. § 2241(c)(3); *Williams v. Taylor*, 529 U.S. 362, 375, n.7 (2000). Venue for a habeas corpus petition is proper in the judicial district where the prisoner is held in custody. *See* 28 U.S.C. § 2241(d).

Petitioner is currently incarcerated at Mule Creek State Prison in Amador County, California. As Petitioner asserts that he is being held in violation of his rights under the United States Constitution, and because Amador County is within the Eastern District of California, the Court has jurisdiction to entertain the petition and venue is proper in the Eastern District. 28 U.S.C. § 84; 28 U.S.C. § 2241(c)(3).

## II. Standard of Review

Section 2254 "is the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment." *Sass v. California Board of Prison Terms*, 461 F.3d 1123, 1126 (9th Cir. 2006) (quoting *White v. Lambert*, 370 F.3d 1002, 1009-10 (9th Cir. 2004)). Under section 2254, a petition for habeas corpus may not be granted unless the state court decision denying Petitioner's state habeas petition "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly...rather, that application must be objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (citations omitted).

## III. Petitioner's Claims

### A. Insufficient Evidence Claim Regarding Petitioner's Felony Conviction

Petitioner contends there was insufficient evidence to convict him on the felony charge of

---

[4] The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) applies to all petitions for writ of habeas corpus filed after its enactment. *Lindh v. Murphy*, 521 U.S. 320, (1997); *Jeffries v. Wood*, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied*, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied*, 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other grounds by Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

annoying Valerie G. (Pet. at 5). Petitioner's conviction must stand if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Davis v. Woodford*, 333 F.3d 982, 992 (9th Cir. 2003) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A federal habeas court "faced with a record of historical facts that supports conflicting inferences must presume -- even if it does not affirmatively appear in the record -- that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* The Court must apply the sufficiency of the evidence standard "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.*

The California Court of Appeal addressed Petitioner's insufficient evidence claim in the last reasoned decision issued by the state. (Lod. Doc. 4). Federal habeas courts must "look through" the summary dispositions to the last reasoned decision issued by the state. *Ylst v. Nunnemaker*, 501 U.S. 797, 806 (1991). Accordingly, the Court reviews the reasoned decision of the California Court of Appeal denying Petitioner relief. The California Court of Appeal addressed Petitioner's insufficiency of evidence claim as follows:

> In the instant case, appellant was charged with annoying or molesting a child under section 647.6, which required proof that his conduct was motivated by an unnatural or abnormal sexual interest in the victim. (People v. McFarland (2000) 78 Cal.App.4th 489, 494.) Appellant submits there was insufficient evidence to demonstrate beyond a reasonable doubt "that appellant's conduct was designed to irritate or disturb, or that the conduct viewed objectively would unhesitatingly disturb a normal person." We must disagree. In addition to conversing with V.G. and inviting her to play miniature golf, appellant repeatedly called her cell phone, called her while she was at school, and left messages for her to call him back. Appellant continued to call V.G. even after she handed her cell phone to her male friend, and the latter told appellant to stop making the calls. At one point, V.G.'s sister-in-law called appellant, advised him of V.G.'s age, and instructed him to stop calling V.G. Appellant nonetheless ignored the sister-in-law's admonition and called V.G. again. When V.G. testified about her initial encounter with appellant, she said appellant made her feel so uncomfortable and upset that she elected to walk home rather than stay at the bus stop and ride on public transportation. V.G. also said she became upset and confused when appellant continued to call her and leave messages on her cell phone. She ultimately informed her mother, who contacted the police department.
>
> The direct evidence of one witness entitled to full credit is sufficient for proof of any fact, except where additional evidence is required by statute. (Evid. Code, § 411.) Under the foregoing facts and circumstances, the jury could reasonably conclude that appellant's conduct would have unhesitatingly irritated or disturbed a normal child. (People v. Kongs, supra, 30 Cal.App.4th at p. 1749.) The judgment on count I is supported by substantial evidence and reversal is not required.

(Lod. Doc. 4 at 16-17).

In determining what evidence is required to convict a person under California Penal Code section 647.6, the pronouncements of the California Supreme Court are dispositive. *See, e.g., Davis*, 333 F.3d at 992; *Souch v. Schaivo,* 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537 U.S. 859 (2002) (federal habeas courts are bound by a state's interpretation of its own laws). As the Court of Appeal noted:

> section 647.6, subdivision (a), does not require a touching but does require (1) conduct a normal person would unhesitatingly be irritated by and (2) conduct motivated by an unnatural or abnormal sexual interest in the victim. The Supreme Court has observed that:
>
>> "[T]he words 'annoy' and 'molest' in former section 647a (now section 647.6, subdivision (a)) are synonymous and generally refer to conduct designed to disturb, irritate, offend, injure, or at least tend to injure, another person. [Citations.] … 'Annoy means to disturb or irritate, especially by continued or repeated acts [citations]; "to weary or trouble; to irk; to offend; to disturb or irritate, esp. by continued or repeated acts; to vex; to molest harm; injure." (Webster's New Internat. Dict. 2d ed.) [P] … Molest is, in general, a synonym for annoy. The term "molestation" always conveys the idea of some injustice or injury. Molest is also defined as meaning to trouble, disturb, annoy or vex. [Citation.] To molest means to interfere with so as to injure or disturb; molestation is a wilful injury inflicted upon another by interference with the user of rights as to person or property. [Citation.] Annoyance or molestation signifies something that works hurt, inconvenience or damage. [Citation.]' [Citation.]
>>
>> "'Annoy' and 'molest' ordinarily relate to offenses against children, with a connotation of abnormal sexual motivation. The forbidden annoyance or molestation is not concerned with the child's state of mind, but rather refers to the defendant's objectionable acts that constitute the offense.

(Lod. Doc. 4 at 14-15) (quoting *People v. Lopez* 19 Cal.4th 282, 289-290 (Cal. 1998)). The Court may not disturb the State Court's determination that Petitioner's alleged conduct was sufficient to satisfy the objective standard for an offense under section 647.6. *See, e.g., Souch,* 289 F.3d at 621. Accordingly, this Court's review is limited to ascertaining whether, based on the prosecution's evidence, any rational trier of fact could have found 1) that Petitioner's committed the acts alleged in the complaint; and 2) that the conduct was motivated by an unnatural or abnormal sexual interest in the victim.

///

### 1. Sufficiency of the Evidence of Petitioner's Conduct

At trial, the victim testified that Petitioner approached her at a bus stop and asked to take her miniature golfing; this made the victim feel uncomfortable, and she decided to leave the bus stop. (RT Vol. 1 at 168-69). The victim also testified that Petitioner called her cell phone repeatedly despite requests to stop. (RT Vol. 2 at 203). During the victim's direct examination, the prosecution played an audio recording of messages left on the victim's voice mail. (Id. at 203). The victim identified the voice in the recording as Petitioner's. (Id.). The prosecution's evidence was sufficient to permit a rational jury to conclude beyond a reasonable doubt that Petitioner called the victim repeatedly, even after Petitioner was told to stop calling and admonished regarding the victim's age. (RT Vol. 1 at 177). This conduct was sufficient to satisfy the "unhesitatingly irritating" element of an offense under section 647.6. (Lod. Doc. 4 at 17).

### 2. Sufficiency of the Evidence of Petitioner's Mental State

In order to be guilty of an offense under section 647.6, Petitioner's actions must have been motivated by an unnatural or abnormal sexual interest in the victim. Cal. Pen. Code. § 647.6(a)(2). At trial, evidence of Petitioner' mental state included testimony regarding several incidents in which Petitioner approached young girls in public and made sexually provocative statements.

Witness T.L. testified that Petitioner approached her on a public bus in July of 2004. (RT Vol.2 at 228). T.L. was sixteen years-old at the time. According to T.L.'s testimony, Petitioner began talking with her and a group of friends about "cooking drugs" while on a public bus. (Id. at 232). At some point during the bus ride, the bus broke down, and all passengers disembarked. (Id.). While T.L. and Petitioner were standing outside of the bus, Petitioner approached T.L. and asker her what grade she was in. (Id.). T.L. did not respond. (Id.). Petitioner then touched T.L.'s face and told her she was pretty, which angered T.L. (Id.). When T.L. and Petitioner got back onto the bus, Petitioner told T.L. that he was about to get a large amount of money and could take T.L. to places where he and T.L. "can be legal together." (Id. at 233).
Petitioner also told T.L. that they could make "pretty babies" together. (Id.).

T.L. conveyed the incident to her mother, who contacted the police. (Id.). T.L. testified that she made a pretext call to Petitioner on the request of the police. (Id. at 237). During the pretext call,

Petitioner invited T.L. to his home and arranged to meet T.L. at a store. (Id.). Petitioner instructed T.L. not to say anything if anyone asked T.L. about her age. (Id.). Officer Stephen Wilson also testified regarding the content of the conversation between T.L. and Petitioner during the pretext call. Officer Wilson testified that Petitioner told T.L. that he wanted to "have sex" when he was asked what he wanted to do with T.L. (Id. at 314).

Other witnesses also testified about incidents between the Petitioner and young girls. Witness D.A. testified that in 2003, Petitioner approached her outside a restroom at her church and asked her where she lived. (RT Vol. 3 at 376). Petitioner continued to ask D.A. where she lived even after she initially refused to answer. (Id.). Petitioner then asked D.A. for her phone number. (Id.). D.A., who was fourteen at the time, felt uncomfortable and reported the incident to a church usher. (Id. at 375). Witness M.G. testified that Petitioner began following her around while she was at a rock concert in 2003. (Id. at 381). M.G. was fourteen at the time. (Id.). Petitioner repeatedly asked M.G. for her name and where she lived, despite M.G.'s refusal to answer. (Id.) After M.G.'s friend told Petitioner that M.G. lived in Delano, California, Petitioner repeatedly asked M.G. for her phone number. (Id. at 383). M.G. testified that Petitioner made here feel "really awkward" and made her feel like going home. (Id.)

The victim's testimony, coupled with T.L., D.A., and M.G.'s testimony, was sufficient to permit a rational jury to conclude beyond a reasonable doubt that Petitioner's conduct was motivated by an unnatural or abnormal sexual interest in the victim. Given the testimony of various witnesses who were approached by Petitioner, a rational jury could have inferred that Petitioner had a habit of contacting young girls based on sexual interest in them. Accordingly, the California Court of Appeal's denial of Petitioner's sufficiency of the evidence claim was not objectively unreasonable, and Petitioner is not entitled to relief under section 2254. *Lockyer*, 538 U.S. at 75 (2003).

**B. Petitioner's Due Process Attack on Propensity Evidence Used Against Him**

Petitioner contends that the use of propensity evidence against him violated his due process rights. As the Supreme Court has reserved the question of whether a trial court's admission of propensity evidence violates the Due Process Clause, *see Alberni v. McDaniel*, 458 F.3d 860, 863-867 (9th Cir. 2006) *cert denied*, U.S. , 127 S.Ct. 1834 (2007) (citing *Estelle v. McGuire*, 502

U.S. 62, 75 n.5, (1991)), the California Court of Appeal's determination that the admission of propensity evidence against Petitioner did not violate his right to due process was neither contrary to nor an unreasonable application of clearly established Federal law, *Mejia v. Garcia*, 534 F.3d 1036, 1946 (9th Cir. 2008). Accordingly, Petitioner is not entitled to relief under section 2254. 28 U.S.C. § 2254(d).

### C. Petitioner's Claims of Evidentiary Error

Petitioner contends that the trial court "abused its discretion" by allowing the prosecution to introduce propensity evidence and evidence that Petitioner had sought counseling in connection with his interest in young girls. (Pet. at 60; 63). Petitioner's allegations of state court error in the application of California's Rules of Evidence are not cognizable in a federal habeas action. *See, e.g., Estelle v. McGuire*, 502 U.S. 62, 67-68 (state law error does not provide grounds for federal habeas relief).[5]

### D. Petitioner's Jury Instruction Claim

Petitioner claims that the trial court improperly instructed the jury with CALCRIM Nos. 1190 and 301. The California Court of Appeal denied Petitioner's claim of instructional error, noting that the instructions were not erroneous under California law and concluding that the instructions did not deprive Petitioner of a fair trial. (Lod. Doc. 4 at ).

The fact that a jury instruction was incorrect under state law is not a basis for federal habeas relief in and of itself. *See Estelle*, 502 U.S. 62, 71-72 (1991). An erroneous jury instruction under state law is only grounds for federal habeas relief where "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *see also Estelle*, 502 U.S. at 72; *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous, or even universally condemned, but that it violated some [constitutional right]'"). Petitioner does not allege that the jury instructions applied to his case

---

[5] In some instances, states' rules of evidence implicate the fundamental fairness guarantee of the Due Process Clause. *See, e.g., Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) (discussing due process limitations on state hearsay rules). Petitioner does not allege that the trial court's evidentiary rulings rendered his trial fundamentally unfair, and any such claim was procedurally defaulted long ago.

rendered his trial fundamentally unfair. (Pet. at 69-72). Rather, Petitioner contends only that the instructions were erroneous under California law, and therefore that the trial court abused its discretion in denying Petitioner's motion for a new trial. (Pet. at 69-72). Petitioner's claim of state law error is not cognizable in a federal habeas action, *see, e.g., Estelle*, 502 U.S. at 67-68, and this Court may not disturb the California Court of Appeal's determination that the jury instructions given at Petitioner's trial were proper under California law. Further, the Court of Appeal's conclusion that the jury instructions given in Petitioner's case did not render Petitioner's trial unfair was not objectively unreasonable under the circumstances. (*See* Lod. Doc. 4 at 29-30). Accordingly, Petitioner is not entitled to relief on his claim of instructional error.

### E. Cumulative Error Claim

Even where no single alleged error warrants habeas corpus relief, the cumulative effect of errors may deprive a petitioner of the due process right to a fair trial. *E.g., Karis v. Calderon*, 283 F.3 1117, 1132 (9th Cir. 2002); *see also Ceja v. Stewart*, 97 F.3d 1246, 1254 (9th Cir. 1996). The California Court of Appeal identified the correct legal standard and held that Petitioner's claim of cumulative error lacked merit. (Lod. Doc. 4 at 30-31).

As discussed above, Petitioner has not established any constitutional error. Accordingly, the California Court of Appeal reasonably concluded that "there was no accumulation of errors constituting a miscarriage of justice." (Lod. Doc. 4 at ). Therefore, Petitioner is not entitled to relief under section 2254.

### IV.   Certificate of Appealability

A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances. *Miller-El v. Cockrell*, 123 S.Ct. 1029, 1039 (2003). The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity

of such person's detention pending removal proceedings.

(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

(B) the final order in a proceeding under section 2255.

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

28 U.S.C. § 2253.

If a court denies a petitioner's petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 123 S.Ct. at 1034; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." *Miller-El*, 123 S.Ct. at 1040.

The Court finds that reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further. Petitioner has not made the required substantial showing of the denial of a constitutional right. Accordingly, the Court hereby DECLINES to issue a certificate of appealability.

**ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1. The Petition for Writ of Habeas Corpus is DENIED with prejudice;

2. The Clerk of Court is DIRECTED to enter judgment; and

IT IS SO ORDERED.

**Dated:   October 21, 2009              /s/ John M. Dixon**

1       UNITED STATES MAGISTRATE JUDGE